IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| TONIA L. ALLEN, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | NO. 2:12-cv-00225-J |
| BABCOCK & WILCOX TECHNICAL | § | |
| SERVICES PANTEX, LLC F/K/A B&W | § | |
| PANTEX TECHNICAL SERVICES, LLC, | § | |
| Defendant | § | |

MEMORANDUM OPINION AND ORDER

Plaintiff Tonia L. Allen ("Plaintiff") filed suit against Defendant Babcock & Wilcox

Technical Services Pantex, LLC f/k/a B&W Pantex Technical Services, LLC ("Defendant" or

"Pantex"), alleging claims for: discrimination under the Americans with Disabilities Act

("ADA") and the Rehabilitation Act ("RA"); failure to accommodate under the ADA; disability-

based hostile work environment harassment under the ADA; retaliation under the ADA; and

violation of the Family Medical Leave Act ("FMLA"). Now pending before the Court is

*Defendant's Motion for Summary Judgment*, filed July 8, 2013. Also before the Court are

*Plaintiff's Response to Defendant's Motion for Summary Judgment*, filed August 23, 2013, and

*Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment and*

*Brief in Support*, filed September 6, 2013. For the reasons detailed below, *Defendant's Motion*

*for Summary Judgment* is GRANTED.

I.      BACKGROUND

Plaintiff began her employment with Defendant in 1983, and, except for a period of time

between 1997 and 2001, Plaintiff continued to work for Pantex until March of 2011. Beginning

in early 2001, Plaintiff was "exposed to job duties involving Beryllium on a daily basis," such

1

that she was ultimately diagnosed with Chronic Beryllium Disease ("CBD") in September of 2004 "as a result of working in said environment." Plaintiff reached a settlement with Pantex in 2004, where "she was compensated for . . . injuries related to her beryllium exposure and the associated CBD diagnosis." The following year, in 2005, Plaintiff applied for and received a position in the Training Department at Pantex, a department within the larger Environmental Safety and Health Division. Based on Plaintiff's performance, she received two pay increases in December of 2005 and December of 2006, and was then promoted to the position of Training Specialist IV in January of 2007. Plaintiff's position necessitated daily interaction with computer-based course development customers, trainees, and other members of the Training Department.

During this time period, Scott Elliott assumed the position of Technical Training Department Manager in 2006. Plaintiff felt, "from the very beginning," that Elliott "hated that [she] was sick," and "just hated [her]" in general. Plaintiff concluded this, based, in part, on the fact that when Elliott was Department Manager, several of Plaintiff's direct supervisors approached her at various times to inform her that her shoes were in violation of company policy and that her attire was inappropriate as excessive cleavage was showing. Elliott also directly approached Plaintiff in her office at one point and called her a "Jesus freak." In 2009, Elliott referred Plaintiff for assessment to determine whether she was still suitable for certification under the Human Reliability Program ("HRP"), a heightened security clearance program. Because of the nuclear materials throughout the Pantex facility, all of Defendant's employees were required to undergo an annual assessment of mental and emotional health to retain their HRP, and were additionally required to report any "concern about the HRP suitability of another employee with HRP certification." Although it was determined that Plaintiff should retain her

HRP certification after this assessment, Plaintiff nonetheless chose to later voluntarily relinquish her certification as part of a company-wide cost-savings effort, along with several other employees.

Plaintiff's health began to decline over the course of 2009. Plaintiff attributes the decline to the stress from working under Elliott. Beginning in January of 2010, Plaintiff started missing an extensive amount of work. Between January of 2010 and March of 2011, "Plaintiff was absent for all or part of 174 days of work, totaling 1,635 missed hours."[1] After Plaintiff exhausted her FMLA leave in May of 2010, she remained on leave through Pantex's Short Term Disability program. On June 3, 2010, Plaintiff received a letter notifying her that she was "approaching the end of the initial 26-week period of disability," which meant that Plaintiff would soon be eligible to apply for Long Term Disability. Plaintiff was also informed that, whether she enrolled in Long Term Disability or not, she would be separated from the company in January of 2011 if she was "still unable to return to work" by then. Although Plaintiff applied for Long Term Disability in June of 2010, she became ineligible for benefits when she chose to voluntarily return to work on July 26, 2010.

Upon Plaintiff's return to work, she was temporarily restricted from working on safety sensitive jobs and performing any work involving critical decision making because one of her prescribed medications was Fentanyl, a potent narcotic. A temporary restriction was also placed on her ability to perform any HRP duties because of that same medication. When Plaintiff reported to the Training Department with her return-to-work documentation, Elliott refused to meet with her. Plaintiff instead met with a direct supervisor and DJ Shead, a Human Resources

---

[1] In 2010, Plaintiff missed all or part of 12 days in January, 18 days in February, 16 days in March, 12 days in April, 19 days in May, 20 days in June, 15 days in July, 7 days in September, 5 days in October, 14 days in November, and 11 days in December. In 2011, Plaintiff missed 18 days in January and 17 days in February.

Generalist, who informed her that, because Plaintiff's Training Specialist IV position required critical decision making, she was being placed in the temporary labor pool. The following day, Plaintiff was assigned to the Quality Division under Jim Stephens. For the following three months, from July to October of 2010, Plaintiff worked under the supervision of Kathy Brack and Pam Butler within the Quality Division. Plaintiff received high reviews from her supervisors based on her performance during this time.

Because Plaintiff preferred working in the Quality Division, when she became aware of a job opening in Quality that required HRP certification, she sought out advice from Pat Allen, a nurse practitioner in the Medical Department, as to how to become eligible for HRP certification again. Allen became irritated and told Plaintiff that "Dr. Simpson would *never* allow [Plaintiff] to get an HRP on the medication [she] was taking." Plaintiff left this encounter with Allen only to discover that Allen had added a medical restriction that permanently prohibited her from becoming eligible for HRP certification. After confronting Allen about the additional restriction, Plaintiff informed her supervisors in the Quality Division that she was ineligible for HRP certification and therefore considered herself ineligible for the job opening.

Plaintiff nonetheless discontinued taking her Fentanyl in an attempt to regain her HRP certification and have the opportunity to bid on the job. When she reported her discontinuation of Fentanyl to the medical department, Plaintiff was informed that she was no longer restricted from working in positions involving critical decision making.[2] She was informed that she would be transferred back to her position as a Training Specialist IV. Throughout this temporary assignment, Plaintiff retained her job title, salary, and benefits.

---

[2] The "permanent" restriction on Plaintiff's ability to obtain an HRP certification was also removed when Plaintiff returned to the Medical Department on October 14, 2010.

4

Upon learning that she would be transferred back to Training, Plaintiff requested a meeting with Scott Kennedy, Pantex Deputy General Manager, where she expressed concerns about working under Elliott, and requested to remain in Quality. Despite Plaintiff's concerns, she was transferred back to Training on October 26, 2010. When she met with Elliott to determine her assignments that day, Plaintiff and Elliott got into an argument where Elliott "started cursing and slamming his fist on the table," telling her that "[his] world [didn't] revolve around keeping up with where [Plaintiff was] working," and telling her to "look at [him] in the eye and . . . tell [him] that [she] didn't go and ask to be transferred out of [Training]." The argument ended with Elliott "slam[ming] the door." Two days after this meeting, on October 28, 2010, Plaintiff filed an Employee Concerns Report, expressing concerns of retaliation, discrimination, harassment, ethics violations, and a hostile work environment. Her report detailed many of the aforementioned events.

After reading Plaintiff's Employee Concerns Report, an Employee Concerns Representative Sheri Davis requested that Kennedy convene a meeting the following Monday, November 1, 2010, to discuss whether Plaintiff should remain in Training or whether she should return to Quality. "After much discussion, the decision was made that [Plaintiff] should stay in Training unless a [hostile work environment claim was] substantiated." While back in Training, Plaintiff received her annual performance evaluation from her direct supervisor, Darryle Hunt. Although Hunt took into consideration the much higher performance evaluation scores provided by Plaintiff's Quality supervisors, Plaintiff's overall evaluation score indicated that she only "sometimes meets expectations," which prevented her from obtaining a merit-based raise.[3] On

---

[3] Pantex's fiscal year runs from October 1st through September 30th of each year, which is why the evaluations are completed towards the end of each calendar year. Plaintiff's annual evaluation indicates that it was "created by"

December 28, 2010, Davis completed the Employee Concern Final Investigation Report regarding Plaintiff's allegations, and found that none of the allegations could be substantiated.

Plaintiff's absences started to escalate again in November of 2010, and as of the end of December, Plaintiff was again on Short Term Disability.[4]  In order to become eligible for Long Term Disability, Plaintiff needed to first exhaust the 26-week period of Short Term Disability; on January 19, 2011, Plaintiff initiated email correspondence inquiring into her eligibility date for obtaining Long Term Disability.  On February 14, 2011, Plaintiff's physician indicated that Plaintiff would "never" return to work on her Health Event Report, a form mandated for employees receiving supplemental pay while on sick leave.  Because of Plaintiff's excessive absenteeism and her physician's representation that Plaintiff would never be returning to work, Defendant terminated Plaintiff on March 8, 2011, informing her that it was "unrealistic and burdensome" to continue to employ her.  Plaintiff thus became ineligible for Long Term Disability benefits through Pantex.

At the time Plaintiff was terminated on March 8, 2011, she had already completed an application for Social Security disability benefits, asserting that she "became unable to work because of [her] disabling condition on September 26, 2010," and that she was still disabled. Plaintiff's application also indicated that she could not "function well enough to work even half a day and [that she] miss[ed] excessive amounts of work due to illness."  Based upon these assertions, in addition to others, Plaintiff was ultimately awarded Social Security benefits.

---

Hunt on October 18, 2010, that the "due date" was November 21, 2010, and that it was "completed" by Hunt and "acknowledged" by Plaintiff on December 20, 2010.

[4] Plaintiff once again became eligible for Short Term Disability on September 15, 2010, because she had worked thirty consecutive days since July 26, 2010, per company policy.  In an email regarding eligibility for her Short Term Disability payments, Plaintiff indicated that she was "not able to maintain work at Pantex, with or without [her] medication, due to illness."

## II.   STANDARD

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322-25. Once the movant makes a properly supported motion, the burden shifts to the non-moving party to show that summary judgment should not be granted; the non-movant may not rest solely upon allegations in the pleadings, but must support the response to the motion with specific facts showing the existence of a genuine fact issue for trial. *Id.* at 321-25; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the non-movant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden." *Douglass v. United Serv. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

### A. *Claim for Discrimination under the Americans with Disabilities Act and the Rehabilitation Act*

As noted above, Plaintiff alleges, among other things, that Defendant discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act and the Rehabilitation Act. Specifically, Plaintiff contends that Defendant "classif[ied] Plaintiff in

7

such a way that adversely affected the opportunities and status of Plaintiff in her employment," and terminated her "based, in part, on her status as an individual with a disability."

   "The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996); 29 C.F.R. § 1630.1. The RA is similarly designed to promote the employment of individuals with disabilities and to prevent discrimination against them, but applies within the context of federally-funded programs and activities.[5]  29 U.S.C. § 701. The legal standards governing claims under the ADA and the RA are identical. *Kemp v. Holder*, 610 F.3d 231, 234-35 (5th Cir. 2010). To prevail on a *prima facie* claim under either statute, Plaintiff must show that she "is a qualified individual with a disability and that [a] negative employment action occurred because of [her] disability." *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1119 (5th Cir. 1998). Should Plaintiff establish her *prima facie* case of discrimination, the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), would apply, requiring Defendant to then "articulate a legitimate, non-discriminatory reason for the adverse employment action." *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000). If Defendant comes forth with a "legitimate, non-discriminatory reason" for the employment action, the burden shifts back to Plaintiff to "establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination." *Id.*

   In its motion for summary judgment, Defendant appears to concede that Plaintiff has a disability. Defendant argues that Plaintiff is not a "qualified individual with a disability," and, accordingly, that she fails to make a prima facie showing of discrimination. A "qualified

---

[5] Both parties agree that the ADA and the RA are both applicable to Defendant, as it is a public entity that receives federal funding.

individual with a disability" is defined as an individual with a disability, who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, Plaintiff could only be considered a "qualified individual with a disability" if she could perform the essential functions of her position with reasonable accommodation.[6] In support of its claim that Plaintiff is not a "qualified individual with a disability," Defendant points to the fact that Plaintiff could not perform the essential functions of her employment position.

Defendant has set forth evidence that "Plaintiff's consistent attendance at work was essential" due to the nature of Training Specialist IV position. As a Training Specialist IV, Plaintiff was responsible for developing and preparing training plans, guides, and manuals; for implementing and controlling training programs based on analysis of work requirements of training needs; and for furnishing assistance to all levels of management regarding employee skill enhancement through formalized training. Plaintiff's position therefore "demanded daily interaction with computer-based course development customers, trainees and the Training Department," and attendance was essential for the long-term project deadlines that predominated her position.

The evidence also establishes that Plaintiff was unable to maintain an acceptable level of attendance at work. Plaintiff was absent for all or part of 174 days of work between January 1, 2010 and March 2, 2011. Because Plaintiff's excessive absences precluded her from completing her assignments, another employee had to be hired to perform Plaintiff's job responsibilities. It is also undisputed that at the time of Plaintiff's termination in March of 2011, Plaintiff had not

---

[6] Essential functions are those that "bear more than a marginal relationship to the job at issue," *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993), but consideration must be given to the employer's judgment "as to what functions of a job are essential . . . ." 42 U.S.C. § 12111(8).

been to work in months, and both she and her physician had indicated that Plaintiff was unable "to maintain work at Pantex, with or without [her] medications, due to illness," and that she would "never" return to work. In that same month, Plaintiff made similar representations on her application for Social Security benefits.[7] Because Plaintiff could not maintain the requisite level of attendance at work, she could not perform the essential functions of her position.

While the ADA requires that courts consider whether an employee could have performed the essential functions of her position with reasonable accommodation, the ADA "does not require an employer to relieve an employee of any essential functions of . . . her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999). Significantly, as many courts have found, "[i]ndefinite leave is not a reasonable accommodation." *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (finding unreasonable the requested accommodation of an "indefinite leave[ ] of absence" so that the plaintiff might be able to return to work "at some uncertain point in the future."); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759-60 (5th Cir. 1996) (adopting the Fourth Circuit's holding that "[r]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected . . . .") (alterations in original) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)); *see also Johnson v.*

---

[7] A plaintiff who has submitted a "sworn assertion in an application for disability benefits that she is . . . 'unable to work' will appear to negate an essential element of her ADA case"—namely, that she can perform the essential functions of her employment position— and as such, "must proffer a sufficient explanation" to account for the "apparent contradiction." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 483 (5th Cir. 2001). Here, Plaintiff's sworn statement that she "became unable to work because of [her] disabling condition on September 26, 2010" would be difficult to reconcile with her recent position that she "was able to perform the essential functions of her job" and "[i]t was not until AFTER Elliott and Training management tore her down mentally and physically after her return to Training in November of 2010, [sic] that Plaintiff became very ill again based upon her disability." Nevertheless, the Court need not even consider Plaintiff's representations on her Social Security disability application, as other evidence sufficiently demonstrates that Plaintiff could not perform the essential functions of her job.

*Children's Hosp. of Philadelphia*, No. CIV. A. 94-5698, 1995 WL 338497, at *2 (E.D. Pa. June 5, 1995) (collecting cases in support of the proposition that "courts . . . have held that substantial and unpredictable absences . . . . need not be accommodated.").

Courts both within this Circuit and without have consistently deferred to an employer's judgment that attendance is an essential function of the job in finding that an employee's inability to meet attendance standards renders the employee "unqualified" under the ADA. *See Amsel*, 464 F. App'x at 400 (concluding that the plaintiff was not "qualified" because he "was not able to come to work and had not been in the office for months at the time of his discharge."); *Crews v. Dow Chemical Co.*, 287 F. App'x 410, 412 (5th Cir. 2008) (relying on the documentation submitted by the plaintiff's physician that the plaintiff could not "return to work in the foreseeable future" as evidence that the plaintiff could not perform the essential functions of her job, and was thus not a "qualified individual with a disability"); *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir. 1999) ("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual."); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 726 (5th Cir. 1998) (concluding that the plaintiff was "not 'otherwise qualified'" because "it was an essential function of his job, as a member of the team, that [the plaintiff] be in the office, . . . and that he work a full schedule," and noting that the plaintiff did not arrive at work "often enough to perform the essential functions of the job"); *Rogers*, 87 F.3d at 759 (recognizing that "an essential element of any . . . job is an ability to appear for work . . . and to complete assigned tasks," and therefore concluding that "[b]ecause [the plaintiff] could not attend work, he [was] not a 'qualified individual with a disability' under the ADA."); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) ("[R]egardless of the fact that [the plaintiff] possessed the necessary . . . skills and performed well when she was at work, [her] frequent absences

rendered her unable to function effectively," precluding her from being a "qualified individual with a disability"); *Fuentes v. Krypton Solutions, LLC*, No. 4:11cv581, 2013 WL 1391113, at *4 (E.D. Tex. April 4, 2013) (noting that, because the plaintiff "was unable to come to work at the time of the adverse employment action," he could not perform an essential function of his job); *Cortez v. Raytheon Co.*, 663 F.Supp.2d 514, 522 (N.D. Tex. 2009) (finding it "undisputed that as of the time of [the plaintiff's] discharge, [she] could not work at all," and because she "could not attend work, she [was] not a 'qualified individual with a disability' under the ADA.").

Plaintiff responds by arguing that she could in fact perform the essential functions of her position and was therefore a "qualified individual with a disability." Plaintiff does not appear to dispute the number of her absences, nor does she dispute that attendance was an essential function of her position; rather, she argues that she "did not have an absenteeism problem but for the harassment and discrimination that she suffered at the hands of Defendant in Training," that she "did NOT have an absenteeism problem while working in the Quality Division," and that her physician's statement that she could "never" return to work was not "definitive." As an initial matter, an employee's allegation that her employer caused her injury is irrelevant to the question of whether she has suffered discrimination under the ADA. *Trotter v. B&S Aircraft Parts & Accessories, Inc.*, No. 94-1404-FGT, 1996 WL 473837, at *9 (D. Kan. Aug. 13, 1996) (pointing out that such an allegation must resound in tort or under a state worker's compensation statute). "Plaintiff's status as a 'qualified individual with a disability' does not depend on the cause of [her] disability, but rather on the extent of [her] disability." *Id.*; *see also August v. Offices Unlimited, Inc.*, 981 F.2d 576, 583-84 (1992) (finding the employee's argument that his employer "caused him to relapse into depression, rendering him totally disabled" was irrelevant, in construing an analogous Massachusetts disability discrimination statute). The relevant inquiry

is always whether Plaintiff was able to perform the essential functions of her job with or without reasonable accommodation. *Burch*, 174 F.3d at 619 ("The law in this area is crystal clear: an otherwise qualified person is 'one who is able to meet all of the [ADA's] requirements in spite of [her] [disability]."); *Trotter*, 1996 WL 473837, at *9.

Plaintiff's argument based on her second contention, that she did not have an absenteeism problem while in Quality, must also fail. The question for the Court is whether Plaintiff was qualified at the time her employment was eliminated, not whether Plaintiff was qualified "during [her] overall tenure." *Amsel*, 464 F. App'x at 400 (rejecting the plaintiff's argument that the court should focus on "his qualifications during his overall tenure," and concluding that "the summary judgment evidence show[ed] that [the plaintiff] was not 'qualified' for his job at the time of his dismissal because he could not perform the job's essential functions."); *Green v. Medco Health Solutions of Texas, LLC*, No. 3:11-CV-2432-B, 2013 WL 2317054, at *7 (N.D. Tex. May 27, 2013) ("The issue of whether a plaintiff is 'qualified' for her position appears to be determined at the time of the adverse employment action."); *Fuentes*, 2013 WL 1391113, at *4 ("[T]he question here is whether [the plaintiff] was qualified at the time he was terminated."). Thus, the affidavit proffered by Plaintiff's Quality supervisor attesting to the fact that Plaintiff "could perform the essential functions of the job to which she was assigned" and that she "did not have excessive absenteeism" while in the Quality Division is irrelevant.

Lastly, Plaintiff disputes the significance of her physician's statement that she could "never" return to work by pointing out that her physician had previously indicated similar prognoses. Neither of the physician's statements that Plaintiff "[could not] go back to work" or "[could not] return to work" indicate the same finality as the diagnosis that Plaintiff could "never" return to work. Further, the fact that Pantex had afforded Plaintiff generous leave in the

13

past does not require that Defendant continue to provide Plaintiff with indefinite leaves of absence. "[P]rior accommodations do not make an accommodation reasonable." *Wood*, 323 F.3d at 1314. Defendant was entitled to rely on Plaintiff's physician's statement that she would "never" return to work. *See Crews*, 287 F. App'x at 412.

Accordingly, this Court finds that Plaintiff could not perform the essential functions of her employment position, "with or without reasonable accommodation." As such, she was not a "qualified individual with a disability." Because Plaintiff has failed to show that she was a "qualified individual with a disability," she cannot establish a *prima facie* case of disability discrimination under the ADA or the RA. Therefore, the Court need not consider the other *prima facie* elements, nor consider the remainder of the *McDonnell Douglas* burden-shifting analysis.

### B. Claim for Failure to Accommodate under the Americans with Disabilities Act

Plaintiff next asserts a claim against Defendant for failing to accommodate her, in violation of the ADA. She maintains that "Defendant discriminated against Plaintiff by failing to accommodate Plaintiff's disability," even though Plaintiff "requested these accommodations." The ADA makes it unlawful "for an employer to fail to accommodate the known limitations of an employee's disability." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). However, because "the ADA requires employers to reasonably accommodate limitations, not disabilities," *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996), it is incumbent upon the employee who needs the accommodation to inform the employer that a limitation exists and that an accommodation is needed. *Id.* (quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)). This is especially true "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open,

14

obvious, and apparent to the employer . . . ." *Taylor*, 93 F.3d at 165. "Further, the ADA provides a right only to "reasonable accommodation[s]," not to "the employee's preferred accommodation[s]" or to accommodations that "would impose an undue hardship" on the employer. *Griffin*, 661 F.3d at 224 (quoting *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)); *Taylor*, 93 F.3d at 162; *Molina v. DSI Renal, Inc.*, 840 F.Supp.2d 984, 1001 (W.D. Tex. 2012). Defendant has moved for summary judgment on the basis that Plaintiff not only failed to provide her employer with notice of the limitations of her disability, but that she also failed to request reasonable accommodations.

Plaintiff responds to the first allegation that she "failed to make her employer aware of any disability limitations" by reiterating that "[i]t is clear that Defendant had notice of Plaintiff's disability[,] as all of Plaintiff's supervisors during the time period in question . . . were aware that Plaintiff had CBD." Plaintiff goes on to argue that "[i]t is undisputed that Plaintiff timely and properly always notified the appropriate [Pantex] officials concerning her absences caused by her disability." Even if Plaintiff's claim that "all of Plaintiff's supervisors . . . were aware that Plaintiff had CBD" were true, the central issue is whether Defendant was aware of the *limitations* imposed by Plaintiff's CBD. The ADA "does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs." *Taylor*, 93 F.3d at 164. As noted above, it was necessary that Plaintiff not only make her disability known, "but also any limitation resulting therefrom." *Id.* Plaintiff has not pointed to specific facts suggesting that she made any limitations of her disability known to Defendant, and thus has failed to adduce summary judgment evidence on the issue.

Even assuming that Plaintiff had notified Defendant of her limitations,[8] the Court must still inquire into whether Plaintiff requested, but failed to receive, reasonable accommodations for her known limitations. Here, Plaintiff points to two accommodations that she requested—that she be transferred permanently to Quality, where she could work under a supervisor other than Elliott, and that she be "allowed . . . to use the 'work from home position' as she might have occasionally needed." As will be seen, neither of these requested accommodations are "reasonable" within the meaning of the ADA. We first address Plaintiff's requested accommodation that she be transferred permanently to Quality, where she would be under the supervision of someone other than Elliott.

Reasonable accommodation may include, among other things, "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position . . . ." 42 U.S.C. § 12111(9). Nonetheless, "[a] disabled employee has no right to a promotion, [or] to choose what job to which he will be assigned . . . ." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007). There is evidence that there was an opening within the Quality Division, but one that required an HRP certification. Although Plaintiff had previously forfeited her HRP certification, she was nonetheless entitled to bid on the position, as was any other interested person. However, because an employer is not "required to alter its job placement procedures" in accommodating an employee, *Cannizzaro v. Neiman Marcus, Inc.*, 979 F.Supp. 465, 475 (1997), Defendant had no obligation to disregard its procedure and transfer Plaintiff to the job which she was not currently

---

[8] Based on the formulation of Plaintiff's argument in her response, presumably Plaintiff has interpreted her "timely and proper[ ]" notifications "concerning her absences caused by her disability" as notice of the limitations of her disability.

qualified for.[9]  The ADA is not read as "requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled.  It prohibits employment discrimination against qualified individuals with disabilities, no more and no less."  *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995); *see also Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) (concluding that the plaintiff "fail[ed] to offer evidence showing that he [was] otherwise qualified to meet the hiring criteria for [certain] requested positions," and as such, was not entitled to the requested accommodation).   Further, as Defendants have pointed out, nothing in the ADA allows Plaintiff "to establish the conditions of her employment, most notably, who will supervise her."  *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996).

Plaintiff next suggests that she should have been afforded the opportunity "to use the 'work from home position' as she might have occasionally needed."  The Fifth Circuit has explicitly stated that "[a]n employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced."  *Hypes*, 134 F.3d at 726.  As established above, due to the nature of her position, which demanded daily interaction with computer-based course development customers, trainees and the Training Department, Plaintiff's attendance at work was essential.  Courts have "consistently held . . . that an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation."  *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122-24 (10th Cir. 2004) (citing a number of cases supporting the proposition that a request to work from home is unreasonable under the ADA, except in the "unusual" case where "physical attendance

---

[9] Plaintiff has attempted to construe the end of her temporary assignment in Quality as a "wrongful[ ] transfer back to Training," but the evidence has made clear that Plaintiff retained her job title, as well as the benefits and salary of a Training Specialist IV.

in the workplace was not an essential function of [the] employment position"); *see also Robertson v. Neuromedical Ctr.*, 151 F.3d 292, 295 (1998) ("[T]he law does not require an employer to transfer from the disabled employee any of the essential functions of his job."); *Cortez*, 663 F.Supp.2d at 525 ("An accommodation that does not permit an employee to perform essential job functions cannot be considered reasonable. In other words, [the employer] was not required to eliminate the requirement that [Plaintiff] appear for work in order to accommodate her disability."). As such, Plaintiff's request to utilize a theoretical "work from home" provision does not constitute a request for reasonable accommodation, and Plaintiff's claim for failure to accommodate must also fail.

### C. Claim for Disability-Based Hostile Work Environment Harassment

Plaintiff also "complains of Defendant's violation of [the ADA's] prohibition against discrimination in employment with a hostile work environment based[,] in whole or in part, upon [her] disability." In support of her argument that she was subject to disability-based harassment, Plaintiff first points to the fact that she "was subjected to an HRP concern investigation" because of Elliott. She then references a number of other events which occurred upon her return from Short Term Disability in July of 2010—that Elliott refused to meet with her when she first returned, that she was erroneously given a return-to-work slip indicating a permanent HRP restriction, and that she was "unbelievably transferred back to Training on November 1, 2010," despite her opposition to such a transfer—that she believes are further evidence of this harassment. Plaintiff also supports her claim by citing the verbal altercation she had with Elliott upon her return to Training, to her placement in the "broom closet" office, and to the fact that her "favorable performance ratings . . . received while in the Quality Division" were "wrongfully downgraded by Training."

18

Plaintiff may succeed on a cause of action for disability-based harassment if she can prove: that she belongs to a protected group; that she was subjected to unwelcome harassment; that the harassment was based on her disability; that the harassment affected a "term, condition, or privilege" of her employment; and that Pantex knew or should have known of the harassment and failed to take prompt, remedial action. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001). "Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of [the ADA]." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998) (noting that a claim for disability-based harassment is "modeled after the similar claim under Title VII."). In order for disability-based harassment to be actionable, it must be "sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *McConathy*, 131 F.3d at 563. The environment must be deemed "both objectively and subjectively offensive," *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008), and thus a court must consider "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Flowers*, 247 F.3d at 236. "Further, a court must be mindful of the fact that . . . isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Ballard v. Healthsouth Corp.*, 147 F.Supp.2d 529, 533 (N.D. Tex. 2001) (quoting *Shepherd v. Comptroller of Pub. Accounts of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999)) (internal quotation marks omitted).

"[H]ostile work environment cases [within the Fifth Circuit] have traditionally set a high bar for the amount and type of proof necessary to proceed on the claim." *Ballard*, 147 F.Supp.2d

at 537 n.5; *see also Flowers*, 247 F.3d at 236 (describing this Circuit's "fairly high standard for severe or pervasive conduct"). *Compare McConathy*, 131 F.3d at 564 (despite a supervisor's "insensitive and rude" comments regarding the slow pace of the employee's recovery from surgery, his reassignment of work away from her, and his insensitivity toward her need for more surgery and time to recuperate, finding that the behavior did not amount to pervasive disability-based harassment), *and Ballard*, 147 F.Supp.2d at 537 (after noting that the evidence "raise[d] doubts about how well [the plaintiff] was liked by his superiors," rejecting the claim that the plaintiff was subject to a disability-based hostile work environment, even though he received oral and written warnings shortly after his HIV disclosure, his annual evaluation was substantially worse than previous evaluations, and he was made to work harder after a full-time employee was replaced by a part-time employee), *with Flowers*, 247 F.3d at 236-37 (concluding there was sufficient evidence to support a jury verdict of disability-based harassment when, immediately after the employee's HIV disclosure, her supervisor and close friend immediately stopped socializing with her and began eavesdropping and spying on her at work, the employer's president refused to shake her hand and openly avoided her at work, the employee was made to undergo four drug tests in a week despite the fact that she had never tested positively in the past, and she was written up three times in a row in a manner likened to an "ambush" each time).

Although Plaintiff and Elliott were perhaps incompatible, as is evidenced by his refusal to speak with Plaintiff upon her return to work in July of 2010 and the subsequent argument between the two in October of 2010, "[i]t is a simple fact that in the workplace, some workers will not get along with one another, and [no court should] elevate a few harsh words or 'cold shouldering' to the level of actionable offense." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003). Additionally, although Elliott recommended Plaintiff for HRP

assessment once in the five years he was her supervisor, the evidence indicates that Elliott was required to report Plaintiff for such an assessment if he had concerns regarding her medications and behavior. Further, as indicated above, even when considered in conjunction with other alleged instances of harassment, a poor performance evaluation does not meet the Fifth Circuit's high standard for disability-based harassment claims. *See Ballard*, 147 F.Supp.2d at 537. Lastly, nothing in previous ADA decisions "indicates that moving an employee to a smaller work station is the type of employment condition that Congress intended to be actionable." *McKay v. Johanns*, 265 F. App'x 267, 269 (5th Cir. 2008) (per curiam). The standards for judging hostile work environments are sufficiently demanding so as to ensure that the ADA does not become a "general civility code," *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and the facts here alleged by Plaintiff simply do not constitute "pervasive or severe" disability-based harassment.[10]

In addition to the fact that Plaintiff has failed to produce evidence of pervasive or severe harassment, Plaintiff has also not shown that Pantex "knew or should have known of the harassment[, but] failed to take prompt, remedial action." *Flowers*, 247 F.3d at 235-36. Plaintiff submitted an Employee Concerns Report, detailing all of the aforementioned incidents of alleged harassment. Defendant immediately took "prompt, remedial action" and convened a meeting with Plaintiff's supervisors and Human Resources personnel to determine if it was appropriate to keep Plaintiff in Training. "After much discussion, the decision was made that [Plaintiff] should stay in Training unless a [hostile work environment claim was] substantiated." After nearly two months of investigation, Defendant concluded its investigation into Plaintiff's Employee

---

[10] It is unclear how the confusion in the Medical Department regarding Plaintiff's HRP status constitutes harassment. As noted above, by the time Plaintiff returned for her follow-up Medical appointment, the "permanent" restriction had been lifted. The Court also fails to see how Plaintiff's transfer back to her Training Specialist position amounts to harassment, let alone disability-based harassment.

Concerns Report and determined that none of the allegations could be substantiated.   Such actions constitute "prompt, remedial action." *See Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 F. App'x 104, 107 (5th Cir. 2009) (concluding that the assignment of a human resources investigator "to look into [the plaintiff's] written complaint" amounted to "immediate remedial action").   Although Plaintiff refers to this as a "sham investigation," and claims that she "was never given a copy of the final investigation," Plaintiff has not provided any evidence in support of her allegation that it was a "sham investigation" and whether she was provided a copy or not is irrelevant.   Thus, not only was there no "pervasive or severe" disability-based harassment, but when Defendant was notified of the events Plaintiff perceived as harassing, it took "prompt, remedial action."   Accordingly, Plaintiff has failed to produce evidence showing the existence of a genuine fact issue on her claim for disability-based hostile work environment harassment.

### D.   Claim for Retaliation under the ADA

Plaintiff has also alleged retaliation by Defendant, in that Plaintiff was terminated as a result of filing her Employee Concerns Report, in violation of the ADA.   In order to establish such a cause of action, Plaintiff must first make a *prima facie* showing of: engagement in an activity protected by the ADA; an adverse employment action; and a causal connection between the protected act and the adverse action.   *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).   Assuming the plaintiff is able to establish a *prima facie* case, the employer must then come forward with a "legitimate, non-discriminatory reason for the adverse employment action." *Id.*   If such a reason is advanced, the plaintiff must then produce sufficient evidence that the proffered reason is a pretext for retaliation. *Id.*   "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*   Here,

Defendant argues that Plaintiff has neither engaged in a protected activity nor shown a causal connection between the alleged protected activity and the adverse employment action.

"To engage in a protected activity, here 'oppos[ing] any act or practice made unlawful by [the ADA],'" Plaintiff must show that she had a "reasonable belief that the employer was engaged in unlawful employment practices." *St. John v. Sirius Solutions, LLLP*, 299 F. App'x 308, 309 (5th Cir. 2008) (per curiam) (alteration in original) (quoting 42 U.S.C. § 12203(a)). The Fifth Circuit has recognized that an informal, internal complaint may be considered activity protected by the ADA's anti-retaliation provision, so long as that complaint asserts a violation of the law. *Paulissen v. MEI Techs., Inc.*, -- F.Supp.2d --, 2013 WL 1787599, at *12 (S.D. Tex. 2013) (citing *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 626 (5th Cir. 2008)); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1335 (2011) ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."). Plaintiff submitted an Employee Concerns Report where she complained, "I should also not be discriminated due to illness—received out here CBD which my doctors believe have led to my immune system problems. This is also against the law!" Taking this evidence in the light most favorable to Plaintiff, Plaintiff's Employee Concerns Report demonstrates that she "was opposing what [she] reasonably believed was an unlawful practice under the ADA," *St. John*, 299 F. App'x at 309, and was thus engaging in protected activity.

Plaintiff cites to three "adverse actions" following the filing of her Employee Concerns Report, which she claims constitute retaliation for so doing. First, Plaintiff claims that her "performance evaluation was changed to reflect lower ratings" in retaliation for her complaint.

She also alleges that her "transfer back to Training on November 1, 2010" was a result of the filing of her complaint. Lastly, she considers her termination to be a form of retaliation for submitting the Employee Concerns Report. The first question that must be addressed is whether these actions are indeed "adverse actions" within the meaning of the ADA. The Supreme Court has made clear that the anti-retaliation provision under the ADA, "unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Rather, it is enough for the *prima facie* showing if the adverse action "is one that a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68; *Aryain*, 534 F.3d at 484.

As an initial matter, "[i]t is beyond dispute that a termination constitutes an adverse employment action." *E.E.O.C. v. IPS Indus., Inc.*, 899 F.Supp.2d 507, 521 (N.D. Miss. 2012). Additionally, although Plaintiff's unfavorable performance evaluation may be considered an adverse employment action, *see Cothran v. Potter*, 398 F. App'x 71, 73-74 (5th Cir. 2010), the same cannot be said of her transfer back to Training. *See Aryain*, 534 F.3d at 485 (noting that the plaintiff's "subjective preference for a different position [did not] make her transfer . . . a materially adverse action."); *Holmes v. Drug Enforcement Admin.*, 512 F.Supp.2d 826, 849 (W.D. Tex. 2007) (finding that the plaintiff could not "create a genuine issue of fact that her transfer from the RAS Chief position or any subsequent transfer qualif[ied] as an adverse employment action under the standard adopted by *Burlington Northern*," because the plaintiff knew she "was occupying a term position" and she "received the same pay and benefits [after the transfer] as she did previously."); *see also Florence v. Runyon*, 990 F.Supp. 485, 497-98 (N.D.

Tex. 1997) (determining that a transfer "does not lend itself to automatic labeling" as an adverse employment action).

Turning to the last element of Plaintiff's *prima facie* case, Plaintiff must establish a causal nexus between the protected activity and the adverse action she suffered. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prime facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). Here, Plaintiff has presented evidence that, although her performance evaluation was started on October 18, 2010, it was "finalized" on December 20, 2010, which was only two months after her Employee Concerns Report. Similarly, Plaintiff's termination came just over four months after she submitted her report. Courts within the Fifth Circuit have found that "a time lapse of up to four months" is sufficient to establish the causal connection element of a retaliation case. *See Evans*, 246 F.3d at 354; *Garrett v. Constar, Inc.*, No. Civ.A 397-CV-2575, 1999 WL 354239, at *5 (N.D. Tex. May 25, 1999). Accordingly, Plaintiff has satisfied the elements for a *prima facie* case of retaliation, but only as it pertains to her performance evaluation and her termination.

The burden of production thus shifts to Pantex to articulate a legitimate, non-retaliatory reason for issuing Plaintiff an unfavorable performance evaluation and for terminating her. Plaintiff's year-end performance evaluation states, in great detail, the reasons for her evaluation scores. Hunt, Plaintiff's supervisor who completed her evaluation, factored in Plaintiff's own self-assessment, as well as the assessment given by her Quality supervisor, in arriving at Plaintiff's final rating. He noted that Plaintiff "is a pleasant individual with a high level of intelligen[ce]" and "many strong, quality attributes," but that "[l]ooking strictly at performance, [Plaintiff] was not able to perform the duties and responsibilities of her job" due to the

"significant amount of time" she was absent from work. Hunt therefore concluded that Plaintiff's evaluation should reflect all of the aforementioned considerations and gave her a final rating of "sometimes meets expectations." Defendant has also submitted evidence showing that Plaintiff's "absence from work, . . . in conjunction with [her] physician's . . . declaration that [Plaintiff] [had] no discernible prospect of ever returning to work," made it unduly burdensome for Defendant to continue to employ her, and was therefore the reason for her termination. Defendant's burden of production is "extremely light," and if Pantex "has produced any evidence 'which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden." *Thornton v. Neiman Marcus*, 850 F.Supp. 538, 543 (N.D. Tex. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Defendant has thus proffered legitimate, non-discriminatory reasons for the adverse actions taken, and the *McDonnell Douglas* framework is therefore no longer applicable. *See Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996).

"We are now left with the ultimate question"—whether Pantex unlawfully retaliated against Plaintiff. As noted earlier, "a plaintiff must show that the adverse employment action would not have occurred 'but for' the protected activity in order to prove unlawful retaliation." *Id.*; *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007). Merely disputing Defendant's assessment of her work performance and her attendance "will not necessarily support an inference of pretext;" Plaintiff must provide specific evidence "which could support a finding that she would not have been fired [or given such a performance evaluation] in the absence of her having engaged in protected conduct." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408-09 (5th Cir. 1999). Plaintiff has failed to offer any such evidence, and "is left with no evidence of retaliation save temporal proximity." *Strong*, 482 F.3d at 808. Temporal

proximity alone is insufficient to prove "but for" causation. *Id.* Summary judgment is therefore appropriate on Plaintiff's retaliation claim.

### E. Family Medical Leave Act Claim

Plaintiff lastly asserts violations of the FMLA. She claims that she was "entitled to[, but did not receive,] 12 work weeks of leave during the period of January 1, 2011 through March 31, 2011 because of her CBD," and that "Defendant intentionally interfered with Plaintiffs [sic] rights provided under the FMLA by denying Plaintiff employment to her previous position, stating that an HRP was required for the position when it had not previously been required for the position." She continues: "[f]urther, when Plaintiff took steps recommended by Defendant to obtain her HRP, she was permanently denied the HRP."

The FMLA contains both prescriptive and proscriptive obligations: it prescriptively prohibits an employer from "interfering with or restraining an employee from exercising, or attempting to exercise, their FMLA rights," and proscriptively prohibits "discrimination or retaliation against an employee for exercising their rights under the FMLA." *Bell v. Dallas Cnty.*, 432 F. App'x 330, 333-34 (5th Cir. 2011); *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (5th Cir. 2001). Defendant has argued, in its motion for summary judgment, that Plaintiff's complaint includes allegations only for FMLA interference and fails to allege "a violation of a proscriptive right under the FMLA." Defendant points to the aforementioned language in Plaintiff's complaint in support of its argument that she alleges only violations of prescriptive rights. Plaintiff responds by noting that she "incorporate[d] by reference the allegations set forth in the preceding paragraphs," which "concern[ ] and relate[ ] to Plaintiff's right not to be discriminated and retaliated against because of her medical disability." As Defendant points out, the proscriptive FMLA rights include "an

employee's right not to be discriminated or retaliated against *for having exercised the right to take FMLA leave*." *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) (emphasis added). Nowhere in Plaintiff's complaint does she assert that the instances of alleged retaliation and discrimination were in response to her FMLA leave, which ended in May of 2010. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). The Court will therefore not consider Plaintiff's FMLA claim regarding proscriptive rights, as described in her response to the motion for summary judgment, and will analyze only her claim regarding prescriptive rights.

The FMLA not only entitles an "eligible employee" the right to as many as twelve weeks of leave during any twelve-month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D), but also the concomitant right "to be restored by the employer to the position of employment held by the employee when the leave commenced[,] or . . . to be restored to an equivalent position with equivalent employment benefits . . . ." 29 U.S.C. § 2614(a)(1)(A)-(B). Thus, to prevail on her interference claim, Plaintiff must show that Pantex either interfered with her right to FMLA medical leave or her right to reinstatement following FMLA leave. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (5th Cir. 2004).

As noted above, Plaintiff argues that she was entitled to, but did not receive, 12 weeks of FMLA leave during the period of January 1, 2011 through March 31, 2011. Defendant contends that Plaintiff cannot show that Pantex interfered with her right to FMLA leave simply because Plaintiff was not eligible for FMLA leave in 2011. An "eligible employee" is one "who has been employed . . . for at least 12 months by the employer [from] whom leave is requested" and who

has worked "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). "Paid vacation, holidays, sick leave, and FMLA leave are not included in the 1,250 hour calculation." *Lyons v. N.E. Indep. Sch. Dist.*, 277 F. App'x 455, 456 (5th Cir. 2008). Because Plaintiff did not work the requisite 1,250 hours over the previous 12 months, Plaintiff was not eligible for FMLA leave "during the period of January 1, 2011 through March 31, 2011," and thus Defendant did not interfere with any such rights.

Defendant has also moved for summary judgment based on the fact that it did not interfere with any of Plaintiff's rights upon her return to work following her FMLA leave. After a qualifying absence, an employee must be restored either to the same position previously held or to a comparable position "with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). Significantly, though, no employee is entitled to "any right, benefit, or position of employment . . . to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3)(B). In addition, the right to restoration "does not arise unless the returning employee is able to perform the essential functions of the position or an equivalent." *Hoge*, 384 F.3d at 245-46. Here, contrary to Plaintiff's contention that she was denied her position because of the lack of an HRP certification, Plaintiff could not return to her Training Specialist IV position because the medications she was on prevented her from engaging in "critical decision making."[11] Whether Plaintiff had taken leave or not, her inability to engage in critical decision making because of her medication would have precluded her from assuming her Training position. Defendant therefore assigned Plaintiff to a position in Quality, which, in addition to being personally preferential to Plaintiff, offered her "equivalent employment benefits, pay, and other terms and conditions of

---

[11] The evidence shows that Plaintiff still lacked an HRP certification when she resumed the Training Specialist IV position after she stopped taking her medication.

employment."  Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA claim.

## IV.    CONCLUSION

As detailed above, Plaintiff has failed to show that there is a genuine issue of material fact regarding any of her claims.  For all of the aforementioned reasons, *Defendant's Motion for Summary Judgment* is GRANTED.

IT IS SO ORDERED.

Signed this ____ day of October, 2013.


MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE